[Civ. No. 32264.    Second Dist., Div. Two.    Jan. 27, 1969.]

HERMAN FRED SUTTER et al., Plaintiffs and Appellants, v. LOLITA A. MADRIN, Defendant and Respondent.

Cavalletto, Webster, Mullen & McCaughey and George D. McKaig for Plaintiffs and Appellants.

Elizabeth H. McCarthy for Defendant and Respondent.

ROTH, P. J.—This appeal is on the judgment roll from a portion of the judgment denying restitution of $20,000 paid on account of the purchase price by appellants Buyers to respondent Seller in connection with an abortive sale of real property. On July 31, 1962, Mr. and Mrs. Sutter, appellants, entered into an escrow agreement to purchase the Oaks Hotel in Ojai, for the sum of $412,500 from respondent Madrin. The trial court found that Mr. Elliot, a real estate broker, acted in behalf of appellants, and Mr. Nalley acted as real estate broker in behalf of respondent, Madrin. Mr. Elliot led appellants to believe they could finance the transaction upon an initial outlay of $50,000 cash representing their total resources. The required financing which Elliot represented to appellants he could consummate during the escrow, was not obtained. Appellants admitted their inability to perform. Respondent cancelled the escrow on October 5, 1962 and retained the $20,000.

Appellants sought restitution of the $20,000 paid by them to respondent on the purchase price. They joined Mr. Elliot as a party defendant, claiming damages for his fraud in falsely representing that he would obtain adequate financing to consummate the sale. Respondent cross-complained for breach of contract, alleging damages in the sum of $40,000.

The trial court denied appellants any recovery from respondent, but did award $21,800 damages to them as against Mr. Elliot for his fraud.

The court denied the relief sought by respondent on her cross-complaint seeking $40,000 damages against appellants. In this regard, the court in its Conclusions of Law recited: "Mrs. Madrin, as cross-complainant, has not proved herself entitled to any damages from plaintiffs for the failure of plaintiffs to complete the purchase of the real property."

The damages referred to in the cross-complaint related to the identical items of damages discussed *infra,* allowed respondent as an off-set to appellants' claim for restitution.

This review is limited to the appeal filed by appellants from that portion of.the judgment denying restitution by respondent of the $20,000 paid to her by appellants. Appellants challenge the sufficiency of the Findings of Fact and Conclusions of Law to support the off-sets considered.

Under the rule of *Glock* v. *Howard & Wilson Colony Co.* (Dec. 1898) 123 Cal. 1 [55 P. 713, 69 Am.St.Rep. 17, 43 L.R.A. 199], defaulting vendees where time is made the essence of the contract of sale, were heretofore not permitted recovery of consideration paid following default. The *Glock* case was modified by *Freedman* v. *Rector etc. of St. Matthias Parish* (1951) 37 Cal.2d 16 [230 P.2d 629, 31 A.L.R.2d 1], and *Royer* v. *Carter* (1951) 37 Cal.2d 544 [233 P.2d 539]. These later decisions permit a defaulting vendee to recover the consideration paid to the vendor, less a set-off for damages sustained by the vendor for loss of the bargain measured by section 3307.[1] In addition, *Royer* says at page 550: "In many cases, however, the vendee's breach may make it necessary for the vendor to incur additional expenses to realize the benefit of his bargain. Given the rule that the value of the property to the seller under section 3307 is ordinarily the market value at the time of the breach (*Employees' Participating Assn.* v. *Pine*, 91 Cal.App.2d 299, 301 [204 P.2d 965], and cases cited), injustice could result if the vendor were not allowed to recover damages for *additional expenses caused him by the vendee's breach.* [Italics ours] Thus in a case where the property is sold at the market value and that value remains constant until after the breach, and the property is then resold at the same price, the vendor could recover no damages under section 3307. He would be forced to pay, however, in addition to the expenses of the first sale, the expenses of the resale. When such additional expenses are the natural consequence of the breach, they may be recovered in addition to those provided for in section 3307."

The $412,500 value of the subject real property remained constant. The trial court allowed such "additional damages" to respondent by way of set-off as against appellants' claim for restitution, apparently under the rule of *Royer*, quoted above, as amplified in *Allen* v. *Enomoto*, 228 Cal.App.2d 798, 804 [39 Cal.Rptr. 815].

Appellants attack the validity of the damage items allowed by the trial court as "natural consequences of the breach," contending that none of them are proper off-set items.

In its conclusions of law, the court states:

"Mrs. Madrin has sustained detriment at least equal in value to the $20,000 amount paid to her by plaintiffs, so that

---

[1]The detriment by the breach of an agreement to purchase an estate in real property, is deemed to be the excess, if any, of the amount which would have been due to the seller, under the contract, over the value of the property to him.

the doctrine of *Freedman* v. *Rector* of preventing forfeiture and avoiding unjust enrichment does not require a judgment ordering her to return any part of said $20,000.00.''

Uncertainty exists as to the precise findings of fact intended by the court to support the foregoing conclusion. The record shows independent sets of findings and conclusions signed and filed on separate dates. The first of these documents was filed on September 8, 1966, and was entitled: *"Findings of Fact and Conclusions of Law in Favor of Defendant, Lolita A. Madrin."* The second was filed on May 19, 1967 and entitled *"Findings of Fact and Conclusions of Law in Favor of Plaintiffs."* The judgment was signed and filed on May 19, 1967.

The findings on September 8, 1966, recite in part:

''6. Defendant Lolita A. Madrin was required by reason of the default of plaintiffs and each of them to expend sums far in excess of the $20,000.00 paid by plaintiffs to defendant Lolita A. Madrin as a down payment and consideration for the execution of the agreement to sell said defendant's property to plaintiffs. Defendant Lolita A. Madrin as a direct result of plaintiff's default was required to expend, by reason of said default of plaintiffs, the sum of $37,500.00.''

''8. Defendant Lolita A. Madrin owes plaintiffs no part of the $20,000.00 down payment paid by plaintiffs to her as consideration for the execution of her agreement to sell plaintiffs her property, nor does she owe plaintiffs any other sum for any reason at all.''

The Findings of Fact on May 19, 1967, complicate the record. In these the trial court found:

''12. Mrs. Madrin received from plaintiffs sums totaling $20,000.00 as deposits on account of the purchase price of the real property; that Mrs. Madrin terminated the escrow for purchase and sale of the real property; that Mrs. Madrin retained the $20,000.00 deposit and refused to return same to plaintiffs; that Mrs. Madrin delivered nothing of value into plaintiffs' possession; that plaintiffs never at any time had any property or asset or other thing of value from Mrs. Madrin.

''13. That at the time Mrs. Madrin first contracted with plaintiffs for the sale of the real property, and at the time when Mrs. Madrin terminated the escrow, and at the time plaintiffs joined in that termination and relinquished any further right to or claim in said real property, and at all times in between, and for some months subsequent to any of

said events, the real property had neither risen nor fallen in value, but remained at precisely the same value of $412,500.00

"14. Mrs. Madrin retained ownership and possession of the real property from October 6, 1962, the date on which she terminated the escrow to plaintiffs, to October 25, 1963, on which date she transferred ownership and possession to others. Mrs. Madrin also retained ownership and possession of the real property all during the period of negotiations with plaintiffs and during the period of the escrow with plaintiffs. Plaintiffs never received at any time from Mrs. Madrin possession or use of said real property, but same was continually retained by Mrs. Madrin.

"15. During the period from October 6, 1962, to October 25, 1963, the normal expenses attributable to ownership and possession and use of the real property continued to be incurred, broken down as follows:

| | |
|---|---:|
| "Salaries, caretaker & maintenance man | $ 3,041.08 |
| "Salaries, housekeeper | 3,097.33 |
| "Payroll taxes | 561.76 |
| "Food for employees | 1,326.31 |
| "Property taxes | 13,750.29 |
| "Insurance | 7,265.04 |
| "Utilities | 5,070.15 |
| "Pool maintenance | 535.09 |
| "Repairs & maintenance | 1,689.22 |
| "Miscellaneous | 246.17 |
| | $36,582.44 |

"16. During the same period, October 6, 1962, to October 25, 1963, normal interest continued to run on certain borrowings previously existing that were secured by trust deeds on the real property, in a total amount of $5,734.18.

"17. Legal expenses of $369.30 were incurred by Mrs. Madrin in connection with the setting up and the canceling of the transaction with plaintiffs. During the subsequent period, October 6, 1962, to October 25, 1963, additional legal expenses of $1,560.77 were incurred by Mrs. Madrin respecting the real property. Also during that period, an appraisal fee of $125.00 was incurred by Mrs. Madrin respecting the real property.

"18. Because she had received and retained $20,000.00 from plaintiffs, Mrs. Madrin paid over to F. M. Nalley, the listing broker, the sum of $5,000.00 out of said $20,000.00, pursuant to the language of the Deposit Receipt document.

"19. All of the items listed in Findings 15 through 18 were actually paid by Mrs. Madrin.

"20. In addition, upon signing the deal with plaintiffs, Mrs. Madrin, through her agents, arranged to pay off in full one of the amounts she had previously borrowed on the security of the real property, and arranged for a discount upon such full payment. The total debt was $109,600.00. Full satisfaction and release could be obtained by paying $100,000.00, thus realizing a savings of $9,600.00. Plaintiffs were not aware of this arrangement. When the deal with plaintiffs did not close, Mrs. Madrin did not pay $100,000.00 to the holder of the secured note, and hence Mrs. Madrin did not achieve the savings of $9,600.00. The discount was in no way tied to or dependent upon the deal with plaintiffs, except that Mrs. Madrin was expecting the necessary $100,000.00 to be produced from the deal with plaintiffs.

"21. No title charges or escrow charges respecting the transaction or the termination thereof were incurred by Mrs. Madrin. No engineering fees or appraisal fees or financing fees respecting the transaction with plaintiffs were incurred by Mrs. Madrin. No legal fees or broker's fees respecting the transaction were incurred by Mrs. Madrin, except those described in Findings 17 and 18 above."

The foregoing Findings of Fact are uncertain, contradictory and misleading. To find that respondent "was required by reason of the default of plaintiffs and each of them to expend sums far in excess of $20,000.00 paid by plaintiffs," and at the same time to conclude that said respondent "has not proved herself entitled to any damages from plaintiffs for the failure of plaintiffs to complete the purchase of the real property" creates an irreconcilable conflict.

The Findings of May 19, 1967, are insufficient to support the judgment because there is no Finding that the damages found were "additional expenses caused her by the breach" of contract on the part of appellants. The May 19, 1967 Findings recite items of detriment and expenses attributable to normal ownership and possession and use of the subject real property which may not qualify as the natural consequences of the breach. Salaries for caretaker and maintenance, $3,041.08; salaries, housekeeper, $3,097.33; payroll taxes, $561.76; food for employees, $1,326.31; and property taxes, $13,750.29, are among these challenged items. There is no clue to determine whether the trial court included such items in the $20,000 off-set figure.

The damages found could be and probably are incidental to the use and ownership of the property. Respondent could have incurred these items of damage if she had never entered a contract with appellants. Operating expenditures were not incurred "in connection with the contract," (*Freedman* v. *Rector etc. of St. Matthias Parish, supra.*) They were not necessarily "caused" by appellants' breach, (*Royer* v. *Carter, supra*). The trial court did not find otherwise. While these expense items might have constituted a "detriment" to respondent, that fact alone is not sufficient grounds for respondent to set them off as against appellants' restitution. A valid off-set is a detriment "proximately suffered . . . as a result of" the breach. (*Branche* v. *Hetzel* (1966) 241 Cal. App.2d 801, 811 [51 Cal.Rptr. 188].) It is uncertain whether or not the trial court allowed these items of detriment, and if it did, whether or not the court did in fact find a causal connection between the breach of contract and such items of detriment.

The Findings of September 8, 1966, do recite that respondent "was required by reason of the default of plaintiffs . . . to expend sums far in excess of the $20,000.00. . . ." If this language could possibly supply a necessary Finding of detriment proximately suffered it is rendered even more uncertain by the fact that judgment was entered eight months after the September 8, 1966 Findings, and there is a question whether or not these earlier Findings were in fact superseded by the later Findings filed on May 19, 1967. The later Findings are silent on whether ". . . such additional expenses are the natural consequences of the breach." (See *Royer* v. *Carter, supra.*) There is a complete omission of any Finding on the value of the use of the property during the time the items of expense were incurred. It may appear that the use value was in excess of expenses incident to ownership. (See *Branche* v. *Hetzel, supra,* at p. 811.)

▆ In *Andrews* v. *Cunningham,* 105 Cal.App.2d 525, the court says at pages 528-529 [233 P.2d 563]: "[1] It is elementary law, recently reiterated in *Fairchild* v. *Raines,* 24 Cal.2d 818, 830 [151 P.2d 260] that: 'Ever since the adoption of the codes, it has been the rule that findings are required on all material issues raised by the pleadings and evidence, unless they are waived, and if the court renders judgment without making findings on all material issues, the case must be reversed.' ▆ [2] It is the equally well settled rule that 'findings of fact should be definite and certain. They should

be so framed that the defeated party can specify intelligibly the particulars in which they are not supported by the evidence, where such point is made.' (24 Cal.Jur. 963-964.)

■ [3] So '[w]here there are contradictory findings about matters material to the merits of a case, and the determination of them . . . is essential to the correctness of the judgment, the judgment cannot stand.' (24 Cal.Jur. 965-967.) ■ [4] Finally '(t)he parties "are entitled to special findings upon the issues thus presented in order that they may point out the precise errors of the trial court upon motion for a new trial and upon appeal." (*Klein* v. *Milne,* 198 Cal. 71, 76 [243 P. 420].)' (*Clements* v. *Lannings,* 89 Cal.App.2d 817, 820 [202 P.2d 98].)"

■ The Findings of May 19, 1967 state "Mrs. Madrin retained ownership and possession of the real property from October 6, 1962, the date on which she terminated the escrow to plaintiffs, to October 25, 1963, on which date she transferred ownership and possession to others."

The type of transaction in which such transfer was made, one year after the breach, and the terms upon which it was made, particularly at the price at which it was disposed of, are left to speculation. It is not shown that Mrs. Madrin resold it in the shortest time possible. For aught shown by the record it may be that Mrs. Madrin profited by the delay.

No finding was made that respondent acted diligently. In *Allen,* at p. 804, the court found that the resale was made " 'within the shortest period of time possible.' " Although the matter of reasonable diligence in regard to a resale is an issue committed to the sound discretion of the trial court, there should be a finding on that issue. ■ Section 3353 of the Civil Code relating to the resale of personal property does not apply to the resale of real property. (*Royer* v. *Carter, supra.*) However, the requirement that such sales must be made "with reasonable diligence" states a policy applicable to resales of real property. Whether the resale is made one, two or three months later, or whether it be a year or more, it should be made with reasonable diligence to qualify the vendor to an allowance of an off-set against the vendee's claim for restitution of money paid and the trial court should so find.

*Allen, supra,* appears to extend the doctrine of *Royer* by including within the language "natural consequences of the breach" items of damage heretofore not regarded as detriment "proximately suffered." (*Royer* v. *Carter* and *Branche*

v. *Hetzel, supra*). That case stated, ". . . [f]ire insurance, mortgage interest and real property taxes . . . are properly allowable as . . . 'additional expenses'." (At page 804.) The court in *Allen*, however, found that a resale in that case was made "within the shortest period of time possible . . . ," (page 804) a period of three months. There is no such finding in the case at bench.

*Royer* appears to limit additional damages to expenses of the resale. There the court says at page 550: "He would be forced to pay, however, in addition to the expenses of the first sale, the expenses of the resale."

To permit items of fire insurance, taxes, mortgage interest and numerous other expenses implicit in the ownership and possession of the property as such "additional expenses" opens the door to many difficult questions. Does a seller have the right to hold indefinitely and sue for loss incurred on expenses as enumerated in *Allen*, as such expenses are incurred or paid or may such expenses be permitted to accumulate? For example, if the owner never resold and held the property at a loss, does a cause of action accrue at his election within the statute of limitations and does he have more than one such action? Must the owner, in order to collect such items of damage, sell within a reasonable period after the breach? To what extent, then, could the defaulting vendee offset the value of the use of the subject property? What would be the effect of an interim increase or decrease in value over the market value on the date of the breach? Is a seller entitled to interest on the agreed purchase price, as suggested in the concurring opinion, for the period of an aborted escrow? Doesn't every seller implicitly waive interest on every purchase price for the duration of every escrow unless explicitly otherwise provided? Does a defaulting vendee assume all the expenses and obligations of unprofitable ownership?

We recognize that uncertainties in the findings are to be resolved in support of the judgment, where reasonably possible; (*Reinsch* v. *City of Los Angeles* (1966) 243 Cal.App.2d 737 at p. 746 [52 Cal.Rptr. 613], and that such findings are presumptively correct. (*Berg* v. *Investors Real Estate Loan Co.*, 207 Cal.App.2d 808 at p. 818 [24 Cal.Rptr. 701].) The findings at bench, however, do not provide adequate guidance for resolution of the issues presented.

For the reasons stated, the judgment is reversed.

Herndon, J., concurred.

FLEMING, J.—I concur in the reversal of a judgment which denies recovery of any part of the $20,000 down payment by the purchasers. The reversal is clearly compelled by the declaration in *Freedman* v. *Rector etc. of St. Matthias Parish,* 37 Cal.2d 16, 19-20 [230 P.2d 629, 31 A.L.R.2d 1], that retention of a down payment which does not reflect actual damages amounts to a penalty.

But in addition to reversing the judgment, I think we should instruct the trial court on the specific application of the law to the facts, particularly since this controversy has been pending since 1962.

The law is found in the Civil Code, in *Freedman* v. *Rector etc. of St. Matthias Parish,* 37 Cal.2d 16 [230 P.2d 629, 31 A.L.R.2d 1], and in *Royer* v. *Carter,* 37 Cal.2d 544 [233 P.2d 539]. A vendor is entitled to damages for a purchaser's breach of contract and may collect them from the amount of the deposit. A vendor may claim two elements of damages: (1) the excess of the contract price over the value of the property at the time of the breach (Civ. Code, § 3307; *Royer* v. *Carter,* at pp. 548, 549, 550; and (2) his actual expenses incurred in the performance of the contract (Civ. Code, § 3300; *Royer* v. *Carter,* at pp. 550, 551; *Freedman* v. *Rector etc. of St. Matthias Parish,* at p. 23).

Here, the purchasers contracted to buy the property for $412,500, paid a deposit of $10,000 to the vendor, and opened an escrow on 31 July to close the sale by 31 August. Subsequently they paid another $10,000 to the vendor, and obtained an extension of the escrow period to 30 September. Thereafter, the purchasers failed to pay the balance of the purchase price, the sale was not completed, and the vendor cancelled the escrow on 5 October. The vendor and the vendor's broker acted in good faith throughout the transaction. The trial court found the value of the property had not changed during the period of escrow.

With respect to the first element of damages, the excess of the contract price over the value of the property at the time of breach, a finding that the value of the property had not changed during the period of escrow was not the equivalent of a finding that the vendor suffered no value damages. It seems obvious that a two-month delay in the right to receive $412,500 damaged the vendor—even though the value of the property did not change in the interim. $412,500 on 30 September is worth less than $412,500 on 31 July, and the right to realize $412,500 on 30 September is less valuable than the

right to realize it on 31 July. I think the vendor in this instance is entitled to damages for the difference in these values. Using the legal rate of interest I would calculate these damages at 2/12ths of 7 percent of $412,500, or roughly $4,800.

The second element of damages consists of a vendor's actual expenses incurred in the performance of the contract. In the present case such expenses were limited to $5,000 paid as a brokerage commission, and $369.30 paid for legal fees connected with the abortive sale. Because of the provisions of Civil Code, section 3307, other items of claimed damages, such as the expense of operating and maintaining the property, were not allowable. Legally, the expense of operating and maintaining the property during the period of the escrow was offset by the value of its possession during the same period, and whether the balance of these items showed net gain or net loss to the vendor is wholly immaterial on the question of damages.

I would direct the trial court to credit the vendor with these specific items of damages and give judgment for the balance of the down payment in favor of the purchasers.

A petition for a rehearing was denied February 26, 1969.